UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
----------------------------------------------------------------

FIRST MERCURY INSURANCE COMPANY,

**Civ. Action No. 3:16-cv-04381-RCC**

Plaintiff,

-against-

**AMENDED COMPLAINT FOR
DECLARATORY RELIEF**

MONITRONICS INTERNATIONAL, INC.,
ALLIANCE SECURITY, INC., ISI ALARMS,
INC., ISI ALARMS NC, INC., VERSATILE
MARKETING SOLUTIONS, INC., MAXIMUM
SECURITY ALARM, POWER HOME
TECHNOLOGIES, LLC, POWER HOME
TECHNOLOGIES, INC., STEADFAST
INSURANCE COMPANY,
LEXINGTON INSURANCE COMPANY,
MT. HAWLEY INSURANCE COMPANY, ABC CORPS 1-50
(Said names being fictitious and unknown entities),
and JOHN DOE INSURERS 1-50 (Said names
being fictitious and unknown entities),

Defendants.
----------------------------------------------------------------

## AMENDED COMPLAINT FOR DECLARATORY RELIEF

Plaintiff First Mercury Insurance Company ("First Mercury"), by and through its counsel,

Michael J. Farrell and Farrell, White & Legg PLLC, brings its Complaint for Declaratory Relief

against Defendants, Monitronics International, Inc. ("Monitronics"), Alliance Security, Inc.

("Alliance"), ISI Alarms, Inc. and ISI Alarms, NC, Inc. (collectively "ISI"), Versatile Marketing

Solutions, Inc. ("VMS"), Maximum Security Alarm ("Maximum"), Power Home Technologies,

LLC and Power Home Technologies, Inc. (collectively "Power Home"), Steadfast Insurance

Company ("Steadfast"), Lexington Insurance Company ("Lexington"), Defendant Mt. Hawley

Insurance Company ("Mt. Hawley"), ABC Corps 1-50, and John Doe Insurers 1-50 as follows:

## THE PARTIES

1.      Plaintiff First Mercury is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware. At all times relevant to this complaint, First Mercury was and is authorized to conduct, and did and does conduct, business in the State of West Virginia.

2.      Defendant Monitronics International, Inc. is a corporation, or other business entity, duly organized and existing under the laws of the State of Texas with its principal place of business located at 2350 Valley View Lane, Suite 100, Dallas, Texas.  Upon information, at all times relevant to this complaint Monitronics was and is authorized to conduct, and did and does conduct, business in the State of West Virginia.

3.      Defendant Alliance Security, Inc. ("Alliance") is a corporation, or other business entity, duly organized and existing under the laws of the State of Delaware, with its principal place of business located at 85 Garfield Avenue, Cranston, Rhode Island.   Alliance Security, Inc. is the new corporate name of Versatile Marketing Solutions, Inc. d/b/a VMS Alarms, a corporation, or other business entity, duly organized and existing under the laws of the State of Rhode Island.  Upon information, at all times relevant to this complaint Alliance was and is authorized to conduct, and did and does conduct, business in the State of West Virginia.

4.      Defendant ISI Alarms, Inc. ("ISI Alarms") is a corporation, or other business entity, duly organized and existing under the laws of the State of Arizona, with its principal place of business located at 8987 W Olive Ave, Peoria, Arizona. Upon information, at all times relevant to this complaint ISI Alarms was and is authorized to conduct, and did and does conduct, business in the State of West Virginia.

5.      Defendant ISI Alarms NC, Inc. ("ISI Alarms NC") is a corporation, or other business entity, duly organized and existing under the laws of the State of North Carolina, with its principal place of business located at 919 N. Main Street, Mooresville, North Carolina. Upon

information, at all times relevant to this complaint ISI Alarms NC was and is authorized to conduct, and did and does conduct, business in the State of West Virginia.

6.      Defendant Maximum Security Alarm ("Maximum") is a corporation, or other business entity, duly organized and existing under the laws of the State of Nevada, with its principal place of business located at 2360 Corporate Circle, Henderson, Nevada. Upon information, at all times relevant to this complaint Maximum was and is authorized to conduct, and did and does conduct, business in the State of West Virginia.

7.      Defendant Power Home Technologies, LLC ("Power Home") is a limited liability company, or other business entity, duly organized and existing under the laws of the State of North Carolina, with its principal place of business located at 4521 Preslyn Drive, Raleigh, North Carolina.   Power Home Technologies, LLC is the new corporate name of Power Home Technologies, Inc, a corporation, or other business entity, duly organized and existing under the laws of the State of North Carolina.  Upon information, at all times relevant to this complaint Power Home was and is authorized to conduct, and did and does conduct, business in the State of West Virginia.

8.      Defendant Steadfast is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in Schaumberg, Illinois.  At all times relevant to this complaint, Steadfast was and is authorized to conduct, and did and does conduct, business in the State of West Virginia. Upon information and belief, Steadfast issued general liability insurance policies to Marketing Contractor Defendant Power Home as required by Power Home's contracts with Monitronics which provide additional insured coverage to Monitronics.

9.      Defendant Lexington is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located in Boston, Massachusetts.

At all times relevant to this complaint, Lexington was and is authorized to conduct, and did and does conduct, business in the State of West Virginia. Upon information and belief, Lexington issued general liability insurance policies to Marketing Contractor Defendant Maximum as required by Maximum's contracts with Monitronics which provide additional insured coverage to Monitronics.

10.     Defendant Mt. Hawley is a corporation duly organized and existing under the laws of the State of Illinois, with its principal place of business located in Peoria, Illinois.  At all times relevant to this complaint, Mt. Hawley was and is authorized to conduct, and did and does conduct, business in the State of West Virginia. Upon information and belief, Mt. Hawley issued general liability insurance policies to Marketing Contractor Defendant Maximum as required by Maximum's contracts with Monitronics which provide additional insured coverage to Monitronics.

11.     Defendants ABC Corps 1-50 are fictitious names and unknown business entities who may have entered into valid and enforceable contracts with Defendant Monitronics substantially similar to the contracts between Defendant Monitronics and the defendants identified in Paragraphs Three through Seven above.  Plaintiff hereby reserves its right to amend the Complaint as a result of pleading such fictitious parties. Alliance, ISI, VMS, Maximum, Power Home and ABC Corps 1-50 shall be referred to herein collectively as "Marketing Contractor Defendants."

12.     Defendants John Doe Insurers 1-50 are fictitious names and unknown insurers who, upon information and belief, issued policies to the Marketing Contractor Defendants as required by certain contracts between them and Monitronics which provide additional insured coverage to Monitronics.  Plaintiff hereby reserves its right to amend the Complaint as a result of

pleading such fictitious parties. Steadfast, Lexington, Mt. Hawley, and John Doe Insurers 1-50 shall be referred to herein collectively as the "Marketing Contractors' Insurers."

## CLAIM FOR DECLARATORY RELIEF

13.     This is an action for declaratory judgment pursuant to the Uniform Declaratory Judgment Act, W.Va. Code §55-13-1 *et. seq*, seeking to resolve matters of actual controversy as to the rights and obligations of the parties in connection with certain insurance policies issued to Monitronics by First Mercury.

14.     First Mercury seeks a declaration that it does not owe any duty to defend or indemnify Monitronics with respect to the damages alleged in the underlying consolidated MDL proceeding, styled *In re Monitronics International, Inc. Telephone Consumer Protection Act Litigation*, MDL No. 1:13-MD-2493, pending in the United States District Court, Northern District of West Virginia (the "MDL Action") and other related proceedings (the "Other Underlying Lawsuits").

15.     In the alternative, should this Honorable Court find that Plaintiff First Mercury owes Monitronics a duty to defend and/or indemnify Monitronics with respect to the MDL Action and Other Underlying Lawsuits, First Mercury seeks a declaration that all of Monitronics' rights to recover from the Marketing Contractor Defendants and the Marketing Defendants' Insurers for defense and indemnification for the MDL Action and/or the Other Underlying Lawsuits are transferred to First Mercury and as such, the Marketing Contractor Defendants and the Marketing Contractor Defendants' Insurers are each required by contract to reimburse First Mercury for any amounts expended in the defense of Monitronics in the MDL Action and/or the Other Underlying Lawsuits and to defend and indemnify Monitronics for the MDL Action and/or the Other Underlying Lawsuits.

16.     A judicial determination and a declaration of the rights and obligations of the parties is necessary and appropriate at this time because First Mercury has no adequate remedy at law that will resolve the current controversy.

## FACTUAL BACKGROUND

### I.      THE UNDERLYING MDL LITIGATION

#### A.      Introduction

17.     Monitronics is a company engaged in the business of home alarm system monitoring and has been named as a defendant in numerous lawsuits around the country (including broadly-defined class actions), along with the various other business entities collectively referred to herein as "Marketing Contractor Defendants," seeking statutory damages because of alleged violations of the federal Telephone Consumer Protection Act (47 U.S.C. § 227 et seq., a/k/a the "TCPA") and various similar state laws and other damages based on alleged telemarketing calls to the home phone numbers of people on the federal "Do Not Call Registry" or using "auto-dialers" to contact cellular telephone numbers for which the holder is charged a fee for receiving the call.

#### B.      The Service Contracts

18.     Monitronics' relationship with the individual Marketing Contractor Defendants is governed by various service contracts entered into between the parties which are alleged by the underlying plaintiffs to ultimately result in Monitronics as the company providing monitoring services under long-term contracts to consumers who purchase alarm systems from the Marketing Contractor.

19.     Alliance, through its predecessor-in-interest VMS, entered into an Alarm Monitoring Purchase Agreement with Monitronics dated April 22, 2008, wherein Alliance

agreed to sell, assign and transfer alarm monitoring contracts to Monitronics ("Alliance AMPA").  A true and accurate copy of the Alliance AMPA is annexed hereto as **Exhibit "A"**.

20.     ISI entered into an Alarm Monitoring Purchase Agreement with Monitronics dated February 21, 2008 and amended on July 11, 2011, wherein ISI agreed to sell, assign and transfer alarm monitoring contracts to Monitronics ("ISI AMPA").  A true and accurate copy of the ISI AMPA is annexed hereto as **Exhibit "B"**.

21.     Maximum entered into an Alarm Monitoring Purchase Agreement with Monitronics dated October 6, 2008, wherein Maximum agreed to sell, assign and transfer alarm monitoring contracts to Monitronics ("Maximum AMPA").  A true and accurate copy of the Maximum AMPA is annexed hereto as **Exhibit "C"**.

22.     Power Home entered into an Alarm Monitoring Purchase Agreement with Monitronics dated March 31, 2011, wherein Power Home agreed to sell, assign and transfer alarm monitoring contracts to Monitronics ("Power Home AMPA").  A true and accurate copy of the Power Home AMPA is annexed hereto as **Exhibit "D"**.

23.     The Alliance AMPA, ISI AMPA, Maximum AMPA, and Power Home AMPA (collectively "AMPA Contracts") each contain an identical hold harmless and indemnification provision, which specifically and expressly required each of the Marketing Contractor Defendants (referred to as "Seller" in the AMPA Contracts) to completely defend and indemnify Monitronics with respect to any liability for damage and personal injury as follows:

> 6.02    Seller shall defend, indemnify and hold harmless [Monitronics] and any related entities and their officers, directors, employees, agents, shareholders and their successors and assigns, from, against and in respect of any and all damages, losses, tax deficiencies, liabilities, costs and expenses resulting from, relating to or arising out of (a) any misrepresentation; (b) any breach of warranty; (c) any nonfulfillment of any agreement or covenant, in any case made by or on the part of the Seller hereunder this Agreement or under any Addendum, including any misrepresentation or breach of warranty in any of the certificates or instruments delivered or to be delivered pursuant hereto or any Addendum; or (d) any claims

by any third party arising from or related to Seller's action or conduct related to or arising from this Agreement or Seller's participation in Purchaser's Authorized Dealer Program...

24.     Further, the Authorized Dealer Program section of the AMPA Contracts contains

the following relevant indemnification language:

> 10.04  Seller shall be solely responsible for complying with all laws, rules, regulations, statutes, governmental directives, orders and ordinances of any kind, relating to telemarketing…(including but no [sic] limited to those rules, regulations and statutes referenced in section 3.17). . . Seller shall indemnify, defend and hold [Monitronics] harmless from and against any liability, damage, cost or expense (including reasonable attorneys' fees) which may be asserted against [Monitronics] as a result of Seller's failure to be incompliance with the provisions of this section, as well as section 3.17.

25.     Section 3.17 of the AMPA Contracts provides, in relevant part, as follows:

> 3.17    Seller is in compliance with all laws, rules and regulations related to any Contract, including, without limitation: the provisions of federal and state laws relating to "truth in lending", "home solicitation contracts" or "home solicitation" of any kind or nature whatsoever; the FCC Telephone Consumer Protection Act Rules; the FTC's Telemarketing Sales Rule; any other state or federal telemarketing and consumer marketing statutes, rules and regulations; and, any other consumer marketing methods which are subject to restrictions under state or federal law…

26.     The AMPA Contracts also contain an "insurance procurement" provision

requiring each Marketing Contractor Defendant obtain and maintain insurance that names

Monitronics as an additional insured as follows:

> 3.21    Seller shall, at all times during the term of this Agreement, at its sole cost and expense procure and maintain in force commercial general liability insurance including product/completed operations coverage, showing Purchaser and any related entity, parent or subsidiary as an additional insured under such policy, insuring against liability for injury or death of a person or for damage to property in an amount of not less than $1,000,000 per occurrence with at least $2,000,000 aggregate for bodily injury and/or property damage and liability combined. Such insurance policy shall require the insurance company to deliver notice to purchaser thirty days prior to any termination, cancellation or modification of such insurance policy.

27.     Upon information and belief, each of the AMPA Contracts was amended to include a "Telemarketing Addendum,"  providing, in relevant part, as follows:

> Seller shall be solely responsible for assuring that all of its operations comply with all laws, rules, regulations, statutes, governmental directives, orders and ordinances of any kind relating to telemarketing, direct mail marketing, or any other marketing or advertising methods, including but not limited to the following: the Telephone Consumer Protection Act; the Federal Communication Commission's Telephone Consumer Protection Act Rules; the Federal Trade Commission's Telemarketing Sales Rule; any other state and federal telemarketing and consumer marketing statutes, rules and regulations; state and federal Do Not Call rules and restrictions; and/or prohibitions to calls placed to cellular devices. Seller further acknowledges that all telemarketing to be performed by Seller is for Seller's sole benefit in securing alarm monitoring agreements with potential customers. At Seller's option, Seller may thereafter offer the alarm monitoring agreements for purchase to Purchaser pursuant to the terms and conditions of the Agreement. . .
>
> Seller shall indemnify, defend and hold Purchaser harmless from and against any claim for liability, damage, loss cost or expense (including reasonable attorneys' fees in investigating or defending any such claim) which may be asserted against Purchaser arising from or resulting from Seller's failure to comply with the provisions of this Telemarketing Addendum.

True and accurate copies of the Telemarketing Addendums executed by Monitronics and Defendants Power Home, Maximum, and Alliance are annexed hereto as **Exhibit "E"**.

**C.     The MDL Action**

28.     Beginning in or about July 15, 2011, private consumers began to file suits against Monitronics, the Marketing Contractor Defendants, and certain manufacturers of home alarm systems seeking damages for alleged telemarketing in violation of the TCPA").

29.     Under 47 U.S.C. § 227(b), nonconsensual, nonemergency calls to cellular phones through the use of an automated telephone dialing system ("ATDS") and artificial or prerecorded voice calls are prohibited.  Persons who receive calls in violation of this provision may bring an action to recover the greater of the monetary loss caused by the violation, or $500.  If the court

finds that defendant willfully or knowingly violated § 227(b), the court may increase the award up to $1,500 per violation.

30.    Under 47 U.S.C. § 227(c), consumers who have registered their telephone numbers on the national Do Not Call Registry cannot receive more than one telephone solicitation within any twelve-month period by or on behalf of the same entity.  Persons who receive calls in violation of this provision can sue the violator and seek the same statutory damages available under 47 U.S.C. § 227(b).

31.    This declaratory judgment action is in respect to Monitronics's claim for insurance coverage from First Mercury for the various TCPA lawsuits filed against Monitronics in various jurisdictions.  Representative suits include, but are not limited to:

| Case Name | Court | Docket Number |
|---|---|---|
| Abramson v. Alliance Security, Inc. | W.D. Pa. | 2:2015-cv-00185 |
| Bank v. Alliance Security Inc. et al | E.D.N.Y. | 1:2014-cv-04410 |
| Beavers et al v. Versatile Marketing Solutions, Inc. et al | N.D.W. Va. | 1:2014-cv-00064 |
| Bennett v. Monitronics International, Inc. et al | S.D. Ala. | 1:2014-cv-00054 |
| Bowler et al v. Monitronics International, Inc. et al | W.D. Wash. | 2:2013-cv-00321 |
| Cain v. Monitronics International, | C.D. Cal. | 8:2013-cv-01859 |
| Cain v. Monitronics International, Inc. | S.D. Cal. | 3:2013-cv-01549 |
| Charvat v. Monitronics International, Inc. et al | S.D. Ohio | 2:2014-cv-01366 |
| Collins v Alliance Security LLC et al | Cal. Super. Ct. | MCC-1401589 |
| Cunningham v. Alliance Security et al | M.D. Tenn. | 3:2014-cv-00769 |
| Cunningham v. The Altitude Group, LLC et al | M.D. Tenn. | 3:2015-cv-00929 |
| Dolemba v. Alliance Security, Inc. et al | N.D. Ill. | 1:2014-cv-02701 |
| Dolemba v. Monitronics International, Inc. et al | N.D. Ill. | 1:2014-cv-01955 |
| Fairley v. Monitronics International, Inc. | N.D. Ohio | 1:2014-cv-00525 |
| Finklea v. Monitronics International, Inc., et al. | S.D. Tex. | 3:2014-cv-00153 |
| Garcia v. UTC Corporation et al | D. Conn. | 3:2014-cv-01005 |
| Giles v. ISI Alarms NC Inc. et al | N.D. Ga. | 1:2013-cv-03377 |
| Hodgin v. Monitronics International, Inc. et al | W.D. Wash. | 1:2013-cv-00263 |
| Hurst v. Monitronics International, Inc. | N.D. Ga. | 1:2015-cv-01844 |
| Kaider v. Monitronics International, Inc. | D. Md. | 8:2015-cv-02138 |
| Makaron v. GE Security Manufacturing Inc et al | C.D. Cal. | 2:2014-cv-01274 |
| Mey et al v. Honeywell International, Inc. et al | S.D.W. Va. | 2:2012-cv-01721 |

| | | |
|---|---|---|
| Mey v. Monitronics International, Inc. et al | N.D.W. Va. | 5:2011-cv-00090 |
| Moser v. Alliance Security, Inc. et al | S.D. Cal. | 3:2014-cv-01914 |
| Newhart v. Monitronics International, Inc. et al | S.D. Fla. | 1:2015-cv-22862 |
| O'Shea v. Alliance Security LLC et al | C.D. Cal. | 8:2013-cv-01054 |
| Primack v. Monitronics International, Inc. et al | N.D. Ill. | 1:2013-cv-07253 |
| Primack v. Monitronics International, Inc. et al | N.D. Ill. | 1:2014-cv-06367 |
| Redden v. Monitronics International, Inc. | S.D.W. Va. | 5:2014-cv-27757 |
| Shapiro v. Alliance Security, Inc. | W.D. Pa. | 2:2014-cv-01213 |
| Shreders v. UTC Fire & Security Americas Corporation, Inc. | N.D. Ill. | 1:2014-cv-01539 |
| Tarizzo v. Alliance Security Inc. | C.D. Cal. | 2:2015-cv-02644 |
| Vaughan v. Versatile Marketing Solutions, Inc. et al | C.D. Cal. | 2:2014-cv-08880 |
| Worsham v. Monitronics International, Inc. et al | D. Md. | 1:2015-cv-02139 |

32.     The majority of these actions have been consolidated into the MDL Action with the operative pleading being a Second Amended Master Consolidated Complaint (the "Master Complaint") that was filed on or about November 21, 2014.  A true and accurate copy of the Master Complaint is annexed hereto **Exhibit "F"**.

33.     The allegations against Monitronics and the Marketing Contractor Defendants are embodied in the Master Complaint.  Generally it is alleged that multiple telemarketing calls were placed by or on behalf of Monitronics in violation of the TCPA either to "landlines" on the federal Do Not Call Registry or to cell phones using auto-dialers. The Master Complaint utilizes the defined term "Monitronics Authorized Dealer" to describe "a security-system dealer who has or had an agreement with Monitronics that permits it to hold itself out as an authorized dealer or distributor of Monitronics services, and who uses telemarketing in its sale efforts."

34.     The Marketing Contractor Defendants are each alleged to be "Monitronics Authorized Dealers."

35.     In a section of the Master Complaint headed "Monitronics is liable for the TCPA violations of Monitronics Authorized Dealers," it is alleged that:

With respect to the telemarketing calls placed to Plaintiffs and putative class members, Monitronics is liable for the TCPA violations of Monitronics Authorized Dealers because:

    a. Monitronics Authorized Dealers placed the calls on behalf of, and for the benefit of, Monitronics;

    b. Monitronics Authorized Dealers placed the calls under Monitronics' actual authority;

    c. Monitronics Authorized Dealers placed the calls under Monitronics' apparent authority; or

    d. Monitronics ratified the illegal conduct of Monitronics Authorized Dealers.

36.    In addition, in this section of the Master Complaint it is alleged that "Monitronics describes its relationships with its dealers in terms that demonstrate joint venture, partnership, and agency relationships with those dealers, and in fact is engaged in such relationships with them."  It is further alleged that Monitronics has "known for years" (including prior to the issuance of the First Mercury Primary and Excess Policies) that some of its "Authorized Dealers," including certain of the Marketing Contractor Defendants, "have been the subject of scores of illegal telemarketing complaints lodged by consumers and government agencies" and that Monitronics provided the Marketing Contractor Defendants, or their employees, with awards and financial benefits, "despite its knowledge of TCPA violations." It is also alleged that "[t]hese facts reveal Monitronics' corporate-wide policy of disregard for TCPA compliance.  This policy has resulted in widespread illegal telemarketing by Monitronics Authorized Dealers with respect to Plaintiffs and putative class members."

37.    Based on these allegations, and in addition to injunctive relief, damages are sought from Monitronics, pursuant to the TCPA, on behalf of three classes defined as follows:

    a. *The UTC-Monitronics-Alliance Class*: All persons or entities within the United States who received, on or after May 18, 2007, a non-emergency telephone call (excluding TSS Survey Class calls) from or

on behalf of UTC, Monitronics, or VMS/Alliance, promoting goods or services:

    i.   to a cellular telephone number through the use of an automatic telephone dialing system or an artificial or prerecorded voice; or

    ii.   to a residential telephone number through the use of an artificial or prerecorded voice; or

    iii.   to a cellular or residential telephone number registered on the national Do Not call Registry and who received more than one such call within any twelve-month period.

b.   ***TSS Survey Class***: All persons or entities within the United States whose telephone numbers were listed on the Do Not Call Registry, and to whom, at any time on or after May 18, 2007, more than one call within any twelve-month period from or on behalf of Defendants UTC, Monitronics, or VMS/Alliance was placed based upon sales leads provided by Total Survey Solutions, promoting goods or services.

c.   ***The Honeywell-Monitronics-ISI Class***: All persons or entities within the United States who received, on or after April 30, 2008, a non-emergency telephone call from or on behalf of Honeywell, Monitronics, or ISI, promoting goods or services.

38.    The following causes of action are asserted in the Master Complaint:

## Count One:

### Violation of § 227(b)(1) for calls made using an ATDS or artificial/prerecorded voice

Each Defendant violated 47 U.S.C. § 227(b)(1) by making calls, either directly or through the actions of others, using an automatic telephone dialing system or an artificial or prerecorded voice to cellular telephone numbers without the prior express consent of the called party, or using an artificial or prerecorded voice to a residential telephone number without the prior express consent of the called party.

## Count Two:

### Violation of § 227(c) for calls placed to numbers listed on the Do Not Call Registry

Each Defendant violated 47 U.S.C. § 227(c) by sending, either directly or through the actions of others, telephone solicitation calls to telephone numbers listed on the national Do Not Call Registry.

39.     The relief sought in connection with these claims against all defendants named in

the MDL Complaint is as follows:

1. That the Court certify the classes proposed above under Rule 23(b)(3) of the Federal Rules of Civil Procedure;

2. For each violation of the TCPA, a $500 penalty awarded to Plaintiffs and each class member;

3. For each willful or knowing violation of the TCPA, a $1,500 penalty awarded to Plaintiffs and each class member;

4. That the Defendants, and their agents, or anyone acting on their behalf, be immediately restrained from altering, deleting or destroying any documents or records which could be used to identify the members of the classes; and

5. That Plaintiffs and all class members be granted such other and further relief as is just and equitable under the circumstances.

## II.     THE FIRST MERCURY PRIMARY POLICIES

### A.     Common Policy Terms of All the Primary Policies

40.     Plaintiff First Mercury issued Commercial General Liability policies to Monitronics on a renewal basis from August 31, 2007 through August 31, 2012, bearing policy numbers FMMI014425, FMMI014425-2, FMMI014425-3, FMMI023427, and FMMI026359 which provided $1 million per occurrence limit and $2 million general aggregate liability limits for each respective year (collectively the "First Mercury Primary Policies").  True and accurate copies of the First Mercury Primary Policies are annexed hereto as **Exhibit "G"**.

41.     The First Mercury Primary Policies, subject to their terms, conditions and exclusions, each provide coverage for "Bodily Injury" and "Property Damage" pursuant to an identical Insuring Agreement that provides, in relevant part, as follows:

> **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
>
> **1.     Insuring Agreement**
>
> **a.**     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result…
>
> **b.**     This insurance applies to "bodily injury" and "property damage" only if:
>
> **(1)**     The "bodily injury" or "property damage" is caused by an occurrence arising that takes place in the "coverage territory"; and

> > (2)   The "bodily injury" or "property damage" occurs during the policy period.

42.   The First Mercury Primary Policies, subject to their terms, conditions, and exclusions, also provide coverage for "Personal and Advertising Injury" pursuant to an Insuring Agreement that provides, in relevant part, as follows:

> **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**
>
> **1.**   **Insuring Agreement**
>
> > **a.**   We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury" or "advertising injury" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" or offense and settle any claim or "suit" that may result…
> >
> > **b.**   This insurance applies to:
> >
> > **(1)**   "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;
> >
> > **(2)**   "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;
> >
> > > but only if the offense was committed in the "coverage territory" during the policy period.

43.   The coverage provided by Coverage B under the First Mercury Primary Policies is limited by the following relevant exclusions:

> This insurance does not apply to:
>
> **a.**   "Personal injury" or "advertising injury":

(1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured;

*** 

## EXCLUSION – WILLFUL VIOLATION OF PENAL STATUTE OR ORDINANCE

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE PART ERRORS AND OMISSIONS COVERAGE PART

Notwithstanding anything to the contrary in the policy to which this endorsement attaches, or in any endorsement scheduled on the declaration of this policy, or in any endorsement subsequently attached to this policy, it is agreed that this insurance does not apply to "bodily injury," "property damage," "personal and advertising injury," or errors or omissions arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the "insured."  There shall be no duty or obligation on the part of the Company to respond to, investigate, or defend the insured from any such claim, demand or suit.

***

44.     Further, each of the First Mercury Primary Policies contain the following relevant

condition:

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

***

**8.     Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us.  The insured must do nothing after loss to impair them.  At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

45.    Each of the First Mercury Primary Policies also contain the following potentially relevant definitions:

## SECTION V – DEFINITIONS

**1.**    "Advertising injury" means injury arising out of one or more of the following offenses:

*** 

**b.**  Oral or written publication of material that violates a person's right to privacy;

***

**3.**    "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

46.    Finally, each of the First Mercury Primary Policies contain the following two Endorsements with respect to coverage for "Errors & Omissions":

## ERRORS AND OMISSIONS

## COMMERCIAL GENERAL LIABILITY COVERAGE PART

Subject to all of the terms, limitations, exclusions and conditions of the policy and all the endorsements attached thereto, we will pay on behalf of the Insured those sums which the Insured shall become legally obligated to pay as damages resulting from the negligent acts, errors or omissions of the named Insured and arising out of the operations of the named Insured to which this insurance applies.

[Form Number CVX-EO1 (07/2001)]

***

ENDORSEMENT

It is agreed Form #CVX-EO1 (07/01) – ERRORS & OMISSIONS
is provided separate limits as listed below.

General Aggregate Limit: $2,000,000.
Products/Completed Operations Aggregate Limit: $2,000,000
Each Occurrence Limit: $1,000,000.

All other terms and conditions remain unchanged.

**B.   Unique Exclusionary Endorsement Contained in the 2011-2012 Policy**

47.     Additionally, the First Mercury Primary Policy in effect from August 31, 2011

through August 31, 2012 also contains a exclusionary endorsement, which provides in relevant

part as follows:

**EXCLUSION – PUNITIVE OR EXEMPLARY DAMAGES**

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This insurance does not apply to any claim for punitive or
exemplary damages, fines or penalties imposed by law, restitution
or any damages which are a multiple of, or in addition to,
compensatory damages including related interest or costs whether
or not such damages, related interest or costs are characterized as
punitive or exemplary damages (hereinafter referred to as punitive
or exemplary damages).  If a "suit" shall have been brought against
the insured for a claim falling within the coverage provided under
the policy, seeking both compensatory and punitive or exemplary
damages, then the company will afford a defense to such action,
however, the company shall not have an obligation to pay for any
costs, interest, or damages attributable to punitive or exemplary
damages.

**III.   THE FIRST MERCURY EXCESS POLICIES**

48.     In addition to issuing the aforementioned primary policies, First Mercury issued

commercial umbrella liability policies to Monitronics on a renewal basis from August 31, 2009

through August 31, 2012, bearing policy numbers CUMI000723, CUMI001047, and

CUMI001352 for each respective year (collectively, the " First Mercury Excess Policies").  True and accurate copies of the excess policies are annexed hereto as **Exhibit "H"**.

49.     The First Mercury Excess Policy that was in effect from August 31, 2009 to August 31, 2010 contains a $5 million per occurrence limit and a $5 million general aggregate limit.

50.     The First Mercury Excess Policy that was in effect from August 31, 2010 to August 31, 2011 contains a $5 million per occurrence limit and a $5 million general aggregate limit.

51.     The First Mercury Excess Policy that was in effect from August 31, 2011 to August 31, 2012, contains a $10 million per occurrence limit and a $10 million general aggregate limit.

52.     The First Mercury Excess Policies, subject to their terms, conditions and exclusions, provide coverage for excess "Bodily Injury" and "Property Damage" pursuant to an Insuring Agreement that provides, in relevant part, as follows:

> ### COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY
>
> **1.     Insuring Agreement**
>
> **a.**     We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking damages for such "bodily injury" or "property damage" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted.  When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit"

seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. At our discretion, we may investigate any "occurrence" that may involve this insurance and settle any resultant claim or "suit", for which we have the duty to defend. But:

\*\*\*

**b.**    This insurance applies to "bodily injury" and "property damage" only if:

**(1)**    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)**    The "bodily injury" or "property damage" occurs during the policy period…

53.    The First Mercury Excess Policies, subject to their terms, conditions, and exclusions, also provide coverage for excess "Personal and Advertising Injury" pursuant to an Insuring Agreement that provides, in relevant part, as follows:

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1.**    **Insuring Agreement**

**a.**    We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "personal advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for such "personal and advertising injury" when the "underlying insurance" does not provide coverage or the limits of "underlying insurance" have been exhausted. When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. At our discretion, we may investigate any offense that may involve this insurance and settle any resultant claim or "suit", for which we have the duty to defend. But:

***

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

54.     The coverage provided by Coverage B under the First Mercury Excess Policies is limited by the following relevant exclusion:

This insurance does not apply to:

**a.** "Personal injury and advertising injury":

(1) Knowing Violation Of Rights Of Another

Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury"

(2) Material Published With Knowledge Of Falsity

Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

(3) Material Published Prior to Policy Period

Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

***

55.     Via Endorsement, the excess policies also incorporate the following relevant exclusion:

**EXCLUSION – WILLFUL VIOLATION OF PENAL STATUTE OR ORDINANCE**

This endorsement modifies insurance provided under the following:

## COMMERCIAL UMBRELLA COVERAGE

Notwithstanding anything to the contrary in the policy to which this endorsement attaches, or in any endorsement scheduled on the declaration of this policy, or in any endorsement subsequently attached to this policy, it is agreed that this insurance does not apply to "bodily injury," "property damage," "personal and advertising injury," or errors or omissions arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the "insured."  There shall be no duty or obligation on the part of the Company to respond to, investigate, or defend the insured from any such claim, demand or suit.

\*\*\*

56.    Further, each of the First Mercury Excess Policies contain the following relevant condition:

### SECTION IV – CONDITIONS

\*\*\*

**9.    Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us.  The insured must do nothing after loss to impair them.  At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

57.    Each of the excess policies also contain the following potentially relevant definitions:

### SECTION V – DEFINITIONS

**1.**    "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.**    Notices that are published include material placed on the internet or on similar electronic means of communication; and

    **b.**  Regarding websites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

***

**3.**  "Bodily injury" means bodily injury, disability, sickness or disease sustained by a person, including death resulting from any of these at any time.   "Bodily injury" includes mental anguish or other mental injury resulting from "bodily injury".

***

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

***

    **e.**  Oral or written publication, in any manner, of material that violates a person's right of privacy;

***

**19.** "Retained limit" means the available limits of "underlying insurance" scheduled in the declarations or the "self-insured retention", whichever applies.

58.    Finally, via endorsement, the excess policies also provide coverage for errors and omissions as follows:

**ERRORS AND OMISSIONS**

**COMMERCIAL UMBRELLA LIABILITY COVERAGE**

Subject to all of the terms, limitations, exclusions and conditions of the policy and all the endorsements attached thereto, we will pay on behalf of the Insured those sums which the Insured shall become legally obligated to pay as damages resulting from the negligent acts, errors or omissions of the named Insured and arising out of the operations of the named Insured to which this insurance applies.

IV.     **THE TENDERS AND RESERVATION OF RIGHTS LETTERS**

59.     Between the dates of June 15, 2011 and June 4, 2015, numerous reservation of rights letters were issued by First Mercury to Monitronics in response to Monitronics' tenders for defense and indemnification with respect to various lawsuits naming Monitronics as a direct defendant, including but not limited to, the lawsuits contained in the MDL Action.  Although each reservation of rights letter addressed a different lawsuit, they all referenced the same policy language and reserved rights to deny coverage on the same grounds.  True and accurate copies of First Mercury's reservation of rights letters are annexed hereto as **Exhibit "I"**.

60.     First and foremost, each reservation of rights letter disclaimed coverage under all of the policies and for all the lawsuits with respect to Coverage A on the basis that there are no allegations of "property damage" or "bodily injury" in the complaints, as required by the insuring clause of Coverage A of First Mercury's Policies.  In the same vein, First Mercury disclaimed coverage under Coverage B's coverage for "personal injury" because the complaints only alleged damages arising out of Monitronic's advertising activities.

61.     However, with respect to Coverage B's coverage for "advertising injury," although not admitting the existence of any "advertising injury," First Mercury agreed to provide a defense to Monitronics in the MDL and Other Underlying Lawsuits, subject to a full and complete reservation of rights, which included the right to:

(1) withdraw from or decline any further participation in the defense of the action if facts become known or circumstances develop to warrant such a course,

(2) refuse to indemnify Monitronics to the extent that any settlement or judgment is not covered under the policies or is otherwise not insurable as a matter of law,

(3) file an action for declaratory relief to obtain a judicial determination of the rights and obligations of FMIC,

(4) seek reimbursement from Monitronics and any and all appropriate insurers and other entities and individuals for costs and expenses FMIC has paid where such expense should have been borne by others.

62.     Other bases by which First Mercury reserved its rights to disclaim coverage include:

(1) No coverage for any damage caused by any "offense" that was not committed during any applicable policy period,

(2) No coverage for damages caused by Monitronics' willful or intentional conduct (including any part of statutory damages ever awarded for "knowing violations of the TCPA"),

(3) Potential application of the separate Willful Violation of Penal Statute or Ordinance Endorsement

(4) The right to deny or limit coverage under the "Errors & Omissions" Endorsement,

(5) The right to deny coverage based on policy language providing that "No person or organization is an insured with respect to the conduct of any current or past venture or limited liability company that is not shown as a Named Insured in the Declarations",

(6) The lack of exhaustion necessary to trigger any obligation under the Excess Policies.

## COUNT I

### (Declaratory Relief under the First Mercury Primary Policies)

63.     First Mercury repeats and reiterates each and every allegation set forth in paragraphs "1" through "62" as though set forth at length herein.

64.     An actual controversy exists among the parties concerning the rights and duties of the parties relating to, and arising from, the primary and excess policies issued by First Mercury to Monitronics.  The declaration of this Court concerning the parties' respective rights and/or duties under the First Mercury Policies will resolve that controversy.

65.     Pursuant to 28 U.S.C. § 2201, First Mercury seeks judgment declaring that First Mercury does not owe any defense obligations or indemnity to Monitronics with respect to the MDL Action under all of the First Mercury Primary Policies for the following reasons:

A.  There is no coverage with respect to Coverage A on the basis that there are no allegations of "property damage" or "bodily injury" in the complaints in which Monitronics has been named as a defendant including all those embodied in the MDL Action, as required by the insuring clause of Coverage A of the First Mercury Primary Policies.

B.  There is no coverage with respect to Coverage B's coverage for "personal injury" because the complaints in the MDL Action only allege damages arising out of Monitronic's advertising activities.

C.  There is no coverage with respect to Coverage B's coverage for "advertising injury" because the complaints in the MDL Action do not allege "oral or written publication of material that violates a person's right to privacy" or any other covered "offense."

D.  There is no coverage with respect to the Errors & Omissions Endorsement because Monitronics is not in the business of telemarketing and/or transmission of automated, unsolicited sales telephone calls.   Thus, the allegations contained in the complaints of the MDL Action do not "arise out of the operations of [Monitronics]."

66.     Notwithstanding whether the claims alleged in the MDL Action fall within the insuring agreements of the primary policies, First Mercury also seeks a judgment declaring that First Mercury does not owe Monitronics indemnification with respect to the claims seeking damages of $1,500 for each willful or knowing violation of the TCPA by Monitronics or

{F1130907.3 }                                                    27

Monitronics's Authorized Dealers by virtue of the First Mercury Primary Policies' exclusion for Willful Violations of a Penal Statute or Ordinance.

67.     First Mercury also seeks a judgment declaring that First Mercury does not owe Monitronics indemnification under the Primary Policy in effect from August 31, 2011 and August 31, 2012 with respect to the claims seeking damages of $500 for each negligent violation of the TCPA and damages of $1,500 for each willful or knowing violation of the TCPA, by Monitronics, or Monitronics Authorized Dealers, in the MDL Action by virtue of the applicability of the Punitive or Exemplary Damages exclusion.

68.     First Mercury also seeks a judgment declaring that because the First Mercury Primary Policies do not provide coverage to Monitronics for the MDL Action and/or Other Underlying Actions, First Mercury is entitled to a judgment declaring that Monitronics must reimburse First Mercury for all attorneys' fees, costs, disbursements and other expenses incurred by First Mercury in the defense of Monitronics in the MDL Action and Other Underlying Actions prior to the date of any such judgment.

## COUNT II

### (Declaratory Relief under the First Mercury Excess Policies)

69.     First Mercury repeats and reiterates each and every allegation set forth in paragraphs "1" through "68" as though set forth at length herein.

70.     Pursuant to 28 U.S.C. § 2201, First Mercury seeks judgment declaring that First Mercury does not owe any defense obligations or indemnity to Monitronics with respect to the MDL Action under all of the excess policies for the following reasons:

    A.     There is no coverage under the excess policies because the "ultimate net loss" does not exceed the limits of First Mercury's primary policies for Property Damage or Bodily Injury that is caused by an Occurrence and

takes place during the policy period; for Personal and Advertising Injury caused by an offense during the policy period; and coverage under the "Errors & Omissions Endorsement."

B.      There is no coverage with respect to Coverage A on the basis that there are no allegations of "property damage" or "bodily injury" in the complaints contained in the MDL Action, as required by the insuring clause of Coverage A of the excess policies.

C.      There is no coverage with respect to Coverage B's coverage for "personal injury" because the complaints in the MDL Action only allege damages arising out of Monitronic's advertising activities.

D.      There is no coverage with respect to Coverage B's coverage for "personal and advertising injury" because the complaints in the MDL Action do not allege "oral or written publication, in any manner, of material that violates a person's right of privacy" or any other covered "offense."

E.      There is no coverage with respect to the Errors & Omissions Endorsement because Monitronics is not in the business of telemarketing and/or transmission of automated, unsolicited sales telephone calls. Thus, the allegations contained in the complaints of the MDL Action do not "arise out of the operations of [Monitronics]."

71.     Notwithstanding whether the claims alleged in the MDL Action fall within the definition of "advertising injury" under Coverage B of the excess policies, First Mercury also seeks a judgment declaring that Monitronics' claim for indemnification with respect to the damages alleged in the MDL Action is excluded under the excess policies by virtue of the applicability of the Knowing Violation Of Rights Of Another exclusion.

{F1130907.3 }

72.     Additionally, First Mercury seeks a judgment declaring that First Mercury does not owe Monitronics indemnification with respect to the claims seeking damages of $1,500 for each willful or knowing violation of the TCPA by Monitronics, or Monitronics Authorized Dealers, in the MDL Action by virtue of the applicability of the Willful Violation of a Penal Statute or Ordinance exclusion contained in the excess policies.

**COUNT III**

(**Declaration of Rights With Respect to the AMPA Contracts**)

73.     First Mercury repeats and reiterates each and every allegation set forth in paragraphs "1" through "72" as though set forth at length herein.

74.     At all times hereinafter mentioned, the alleged damages in the MDL Action arose while the AMPA Contracts were in full force and effect.

75.     The alleged damages in the MDL Action directly relate to, and arise out of, the conduct of the Marketing Contractor Defendants, or third parties they hired or controlled, in the performance of their obligations and duties under the AMPA Contracts.   Specifically, the allegations in the MDL Action directly relate to Section 3.17 of the AMPA Contracts, which provides, in relevant part, as follows:

> ***Seller is in compliance with all laws, rules and regulations related to any Contract, including, without limitation:*** the provisions of federal and state laws relating to "truth in lending", "home solicitation contracts" or "home solicitation" of any kind or nature whatsoever; ***the FCC Telephone Consumer Protection Act*** Rules; the FTC's Telemarketing Sales Rule; ***any other state or federal telemarketing and consumer marketing statutes, rules and regulations;*** and, any other consumer marketing methods which are subject to restrictions under state or federal law… [Emphasis added]

76.     The alleged damages in the MDL Action fall within the indemnity provisions of the AMPA Contracts, which provide, in relevant part, as follows:

> 6.02    Seller shall defend, indemnify and hold harmless [Monitronics] and any related entities and their officers, directors, employees, agents, shareholders and their successors and assigns, from, against and in respect of any and all damages, losses, tax deficiencies,

liabilities, costs and expenses resulting from, relating to or arising out of (a) any misrepresentation; (b) any breach of warranty; (c) any nonfulfillment of any agreement or covenant, in any case made by or on the part of the Seller hereunder this Agreement or under any Addendum, including any misrepresentation or breach of warranty in any of the certificates or instruments delivered or to be delivered pursuant hereto or any Addendum; or (d) any claims by any third party arising from or related to Seller's action or conduct related to or arising from this Agreement or Seller's participation in Purchaser's Authorized Dealer Program...

***

10.04  Seller shall be solely responsible for complying with all laws, rules, regulations, statutes, governmental directives, orders and ordinances of any kind, relating to telemarketing…(including but no [sic] limited to those rules, regulations and statutes referenced in section 3.17). . . Seller shall indemnify, defend and hold [Monitronics] harmless from and against any liability, damage, cost or expense (including reasonable attorneys' fees) which may be asserted against [Monitronics] as a result of Seller's failure to be incompliance with the provisions of this section, as well as section 3.17.

77.     Despite tender letters provided to the Marketing Contractor Defendants on behalf of Monitronics, they continue to wrongfully refuse to satisfy their obligations to Monitronics under the AMPA Contracts to defend and indemnify them for the costs they incurred, and continue to incur, in the MDL Action and/or Other Underlying Actions.

78.     Monitronics has suffered, and will continue to suffer damages, harm and prejudice by virtue of the failure of the Marketing Contractor Defendants to fulfill their contractual obligations to defend and indemnify Monitronics in the MDL Action and/or Other Underlying Actions.

79.     First Mercury seeks judgment declaring that in the event this Honorable Court finds that Monitronics is entitled to coverage under First Mercury's primary and excess policies in the MDL Action and/or Other Underlying Actions:

A. First Mercury will automatically acquire from Monitronics immediately upon the issuance of any payment to Monitronics for defense and indemnification costs in the MDL Action or Other Underlying Actions, all of Monitronics'

rights to recover from others, including the Marketing Contractor Defendants; and

B. Each of the Marketing Contractor Defendants are obligated pursuant to the AMPA Contracts to reimburse First Mercury for any and all defense and indemnification payments made to date in connection with the MDL Action and/or the Other Underlying Actions to the extent that any such payment arises out of Monitronics' contractual arrangement with each such Marketing Contractor Defendant.

80.     Notwithstanding whether coverage is triggered for Monitronics under the First Mercury primary and excess policies, First Mercury is entitled to a judgment declaring that each of the Marketing Contractor Defendants are obligated pursuant to the AMPA Contracts to reimburse First Mercury for any and all defense and indemnification payments made to Monitronics in connection with the MDL Action and/or the Other Underlying Actions.

**COUNT IV**

**(Declaratory Relief under the Policies Issued by the Marketing Contractors' Insurers)**

81.     First Mercury repeats and reiterates each and every allegation set forth in paragraphs "1" through "80" as though set forth at length herein.

82.     Upon information and belief, the Marketing Contractor Defendants complied with the insurance procurement provisions contained in the AMPA Contracts and did in fact procure commercial general liability coverage with respect to the AMPA Contracts naming Monitronics as an additional insured.

83.     The alleged damages in the MDL Action and the Other Underlying Actions implicate the coverage provided to Monitronics by the Marketing Contractors' Insurers pursuant to the provisions of the AMPA Contracts, which require that each Marketing Contractor

Defendant name Monitronics as an additional insured under their commercial general liability policy.

84.     First Mercury seeks judgment declaring that in the event this Honorable Court finds that Monitronics is entitled to coverage under First Mercury's primary and excess policies in the MDL Action:

> A.  First Mercury will automatically acquire from Monitronics immediately upon the issuance of any payment to Monitronics for defense and indemnification costs in the MDL Action or Other Underlying Actions, all of Monitronics' rights to recover from the Marketing Contractors' Insurers as additional insureds under the commercial general liability issued to Marketing Contractor Defendants; and

> B.  Each of the Marketing Contractors' Insurers are obligated, pursuant to the commercial general liability policies issued to Marketing Contractor Defendants, to reimburse First Mercury for any and all defense and indemnification payments made in connection with the MDL Action and/or the Other Underlying Actions to the extent that any such payment arises out of the additional insured coverage owed to Monitronics under each of the commercial general liability policies issued by the Marketing Contractors' Insurers to each such Telemarketing Contractor Defendant.

85.     Notwithstanding whether coverage is triggered for Monitronics under the First Mercury primary and excess policies, First Mercury is entitled to a judgment declaring that each of the Marketing Contractors' Insurers are obligated, pursuant to the commercial general liability policies issued to the Marketing Contractor Defendants naming Monitronics as an additional insured, to reimburse First Mercury for any and all defense and indemnification payments made

in connection with the defense of the MDL Action and/or the Other Underlying Actions prior to the date of entry of the court's declaratory judgment in this matter.

WHEREFORE, Plaintiff First Mercury prays for judgment in their favor and against Defendants as follows:

A. For a declaration that First Mercury has no obligation to provide coverage to Monitronics under First Mercury's primary and excess policies for the MDL Action;

B. For First Mercury's attorneys' fees and costs of suit if there is no coverage;

C. In the alternative, for a declaration that, in the event this Honorable Court finds that Monitronics is entitled to coverage under First Mercury's primary and/or excess policies: 1) First Mercury is automatically subrogated to the rights of Monitronics under the AMPA Contracts and that the Marketing Contractor Defendants are required by those contracts to fully defend and indemnify Monitronics (including reimbursement to First Mercury of all past defense or indemnity payments made by First Mercury) in connection with the MDL Action and the Other Underlying Actions and 2) First Mercury is automatically subrogated to the rights of Monitronics as an additional insured under the commercial general liability policies issued by the Marketing Contractors' Insurers to Marketing Contractor Defendants and that the Marketing Contractors' Insurers are required by those CGL policies to fully defend and indemnify Monitronics (including reimbursement to First Mercury of all past defense or indemnity payments made by First Mercury) in connection with the MDL Action and Other Underlying Actions; and

D. For such other and further relief as the Court deems equitable and just.

**First Mercury Insurance Company**

**By Counsel**

{F1130907.3 }

34

  /s/ Michael J. Farrell
Michael J. Farrell (WVSB# 1168)
FARRELL, WHITE & LEGG PLLC
914 Fifth Ave.
P.O. Box 6457
Huntington, WV 25772
Phone: (304)522-1900
Fax: (304)522-9162
mjf@farrell3.com
*Counsel for Plaintiff First Mercury*
*Insurance Company*

And

Christopher R. Carroll, Esquire
Mark F. Hamilton, Esquire
**Carroll, McNulty, Kull**
120 Mountain View Blvd.
P.O. Box 650
Basking Ridge, NJ 07920
(908)848-6300 (office)
(908)848-6310 (fax)
ccarroll@cmk.com
mhamilton@cmk.com
*Pro Hac Vice Counsel*

And

Kevin J. O'Toole, Esquire
Peter V. Koenig, Esquire
**O'Toole Fernandez Weiner Van Lieu**
60 Pompton Avenue
Verona, NJ 07044
(973)239-5700 phone
(973)239-3400 fax
KOToole@ofwvlaw.com
PKoenig@ofwvlaw.com
*Pro Hac Vice Counsel*